**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

JOHN E. MILLER, )
)
      Plaintiff, )
)
   v. )   Civil Action No. 11-377-LPS-SRF
)
C.O. CHRISTINE CONING, )
C.O. BLAKE WARNICK, )
WARDEN PERRY PHELPS, )
C.O. SGT. MCGINNIS, )
C.O. CPL. SCHAFFER, AND )
C.O. RAYMOND HANNUM, )
)
      Defendants. )

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

   Presently before the court in this civil rights action is a motion for summary judgment filed by Defendants Christine Coning ("Coning"), Blake Warnick ("Warnick"), Warden Perry Phelps ("Warden Phelps"), William McGinnis ("McGinnis"), Jason Schaffer ("Schaffer"), and Raymond Hannum ("Hannum") (collectively, the "Defendants").[1] (D.I. 73) The Plaintiff, John E. Miller ("Plaintiff"), an inmate at the James T. Vaughn Correctional Center ("JTVCC") near Smyrna, Delaware, opposes the Defendants' motion.[2] (D.I. 76) For the reasons set forth below, I recommend that the court grant in part and deny in part the Defendants' motion for summary judgment.

---

[1] Warden Phelps was the warden of the James T. Vaughn Correctional Center at the time Plaintiff filed this action. All other named Defendants were correctional officers at JTVCC during the relevant time period. (D.I. 3 at 6)

[2] Plaintiff also filed motions for an evidentiary hearing (D.I. 78) and for leave to file a sur-reply brief (D.I. 79), both of which concern the issue of exhaustion of administrative remedies. As discussed below, these measures are unnecessary and denied as moot. *See infra* Section IV(F).

1

## II.    BACKGROUND

### A.    Procedural History

Plaintiff filed this *pro se* action on April 28, 2011, alleging violations of his constitutional rights pursuant to 42 U.S.C. § 1983.[3] (D.I. 3) Plaintiff proceeds *in forma pauperis*. (D.I. 5)

On July 12, 2011, after screening the complaint, the court issued a Memorandum Opinion and Order (D.I. 10) dismissing several of Plaintiff's claims for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1). *Miller v. Coning*, 2011 WL 2708649, at *7 (D. Del. July 12, 2011). The court gave Plaintiff thirty days to correct certain pleading deficiencies and file an amended complaint. *Id.* Plaintiff filed an amended complaint on August 5, 2011. (D.I. 11)

On September 28, 2011, the court issued a Memorandum Opinion and Order (D.I. 13, 14) permitting Plaintiff to proceed with claims against Coning and Warnick for labeling Plaintiff a snitch; against Coning, Warnick, McGinnis, Hannum, and Schaffer for retaliation; and against Warden Phelps for failure to protect. *Miller v. Coning*, 2011 U.S. Dist. LEXIS 110731, at *1, 13-14 (D. Del. Sept. 28, 2011).

### B.    Factual Background[4]

The claims at issue in this matter stem from what Plaintiff refers to as the "Coning [I]ncident." (D.I. 11 at 9) According to Plaintiff, the Coning Incident encompasses several factors: (1) Plaintiff had a "fling" with Coning, but he ended the relationship and later turned

---

[3] When bringing a § 1983 claim, the plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

[4] The factual background section is based, in part, on the court's earlier decisions in this case, which set forth in detail the allegations of Plaintiff's complaint. *See Miller v. Coning*, 2011 WL 2708649, at *1-2 (D. Del. July 12, 2011); *Miller v. Coning*, 2011 U.S. Dist. LEXIS 110731, at *1-5 (D. Del. Sept. 28, 2011).

down her sexual advances; (2) Plaintiff filed a civil lawsuit, *Miller v. Danberg*, No. 08-271-JCJ, against correctional officers on May 6, 2008 (the "2008 Litigation")[5]; (3) Plaintiff tried to protect Coning from an inmate who was "ratting her and Officer Warnick out for bringing inmates stuff they weren't allowed to have by warning her and Officer Warnick"; (4) Plaintiff "ratted on an officer" when, during an investigation, Plaintiff told the investigating officer that he overheard an inmate exposing Coning for "bringing stuff to inmates" and Coning later learned that Plaintiff had informed the investigating officer of the conversation; and (5) offensive pictures of Coning were found in Plaintiff's cell. (D.I. 11 at 9-10)

As a result of the Coning Incident, Plaintiff claims that Coning and Warnick labeled him a snitch to inmates and correctional officers. (*Id.* at 9) Because of the snitch label, Plaintiff was attacked by inmates and harassed by correctional officers. (*Id.*) Plaintiff further alleges that Coning, Warnick, McGinnis, Hannum, and Schaffer retaliated against him in response to the Coning Incident. (*Id.* at 9-14)

Plaintiff claims that Coning retaliated against him by labeling him a snitch (*id.* at 9), and by accusing Plaintiff of calling her from the prison telephone during his work assignment, in an attempt to frame him. (*Id.* at 10) Plaintiff asserts that Warnick labeled him a snitch to inmates and correctional officers, harassed him with multiple shakedowns, and trashed his cell. (*Id.*)

According to Plaintiff, McGinnis threatened to fabricate a misconduct report against Plaintiff, and made statements that implicate officers in an "overall conspiracy to make [Plaintiff's] time/life hard over the Coning thing." (*Id.* at 11-12) On November 23, 2010, McGinnis allegedly fabricated a misconduct report against Plaintiff for violating several prison

---

[5] Plaintiff named Coning and Warnick as defendants on October 5, 2009, but subsequently dismissed them from the action. *See Miller v. Danberg*, No. 08-271-JCJ, D.I. 51, 82.

3

rules. (*Id.*) Plaintiff was found guilty of all charges and sanctioned to a seven-day loss of all privileges. (*Id.*)

Hannum allegedly threatened Plaintiff over the Coning Incident and retaliated against him with multiple cell shakedowns. (*Id.* at 12-13) According to Plaintiff, Hannum made it clear that the cell shakedowns were intended as payback. (*Id.*)

Schaffer, who is Coning's alleged boyfriend, stared at Plaintiff with a look Plaintiff describes as "grit," and stated that he is well connected and inmates are helpless against him. (*Id.* at 13-14) Schaffer also "shouldered into" Plaintiff and taunted him to "do something about it." (*Id.*) Schaffer told other inmates that Plaintiff is a snitch, and prompted them to "jump" Plaintiff without worrying "about getting into trouble for it." (*Id.*)

Plaintiff notified Warden Phelps of the harassment by correctional officers and physical attacks by inmates that occurred because of his snitch label. (*Id.* at 5-7) Plaintiff wrote to Warden Phelps and asked him to intervene each time something happened. (*Id.* at 5) Plaintiff alleges that Warden Phelps failed to protect him and, as a result, he sustained various injuries. (*Id.* at 5-7)

Plaintiff seeks expungement of all disciplinary reports from his prison file relating to the incidents alleged in this lawsuit, as well as compensatory damages.[6] (*Id.* at 15)

### C.    Plaintiff's Grievances and Letters to the Warden

Plaintiff has taken the following steps to resolve his claims internally, at the administrative level.

---

[6] Plaintiff initially sought $10,000.00 for physical and psychological/emotional damages (*see* D.I. 11 at 15), but subsequently amended his complaint and increased the amount of damages to $1,000,000.00. (D.I. 38 at 1; D.I. 46 at 2)

4

- On November 8, 2009, Plaintiff filed Grievance 191092 to complain that certain photographs (allegedly of Coning) were taken from his cell during a shakedown.[7] (D.I. 75 at A-51)

- On January 10, 2010, Plaintiff filed Grievance 194459 to report that an inmate "squirted [excrement] under [his] door," which soiled him and his clothing. (D.I. 76, Ex. 9)

- On January 18, 2010, Plaintiff filed Grievance 194753 to report that an inmate spit on his window in front of a guard, and the window was never cleaned. (*Id.*, Ex. 11)

- On June 15, 2010, Plaintiff filed Grievance 204473, which states, "Blake Warnick and Christine Coning are retaliating against me over a civil suit, shakedowns, confiscating legal work, destroying property, sexual harassment by Christine Coning." (D.I. 75 at A-78 to A-79; D.I. 76, Ex. 1) Plaintiff requested that the retaliation stop. (D.I. 76, Ex. 1) The prison conducted an investigation, and the grievance was subsequently marked as resolved. (D.I. 75 at A-78 to A-79)

- On June 23, 2010, Plaintiff filed Grievance 204538 to report that three inmates had beaten him with locks wrapped in socks. (D.I. 75 at A-80; D.I. 76, Ex. 2) Plaintiff indicated that he was attacked because Coning and Warnick labeled him a snitch, and he requested an investigation. (*Id.*) The prison conducted an investigation and found no connection between the incident and Coning or Warnick. (*Id.*) Plaintiff appealed the decision at each level of review until his appeal was denied at the highest administrative level. (D.I. 75 at A-80 to A-87)

- On September 28, 2010, Plaintiff wrote a letter to Warden Phelps stating that Hannum threatened him in connection with the Coning Incident. (D.I. 76, Ex. 16)

- On October 19, 2010, Plaintiff wrote a letter to Warden Phelps stating that Hannum was harassing and threatening him. (*Id.*, Ex. 18) Plaintiff indicated that Hannum shook down his cell three times and, on one occasion, told Plaintiff's cellmate that the shakedowns were intended as "payback" to Plaintiff. (*Id.*)

- On November 3, 2010, Plaintiff wrote a letter to Warden Phelps stating that Schaffer was "trying to intimidate" him by "scowling" at him in connection with the Coning Incident. (*Id.*, Ex. 20)

- On November 11, 2010, Plaintiff wrote a letter to Warden Phelps claiming that he was "still getting harassed by [] Schaffer," and that Shaffer stated "how he's connected and how people owe him favors." (*Id.*, Ex. 21)

- On November 15, 2010, Plaintiff sent a letter to Warden Phelps, stating that he was "getting tripple [sic] teamed by guards harassing [him] over" the Coning Incident, and that McGinnis threatened him with "a class one write-up." (*Id.*, Ex. 28)

---

[7] Grievance 191092 is discussed in the affidavit of Michael Little, the JTVCC Legal Service Administrator, who researched the grievance reports filed by Plaintiff between June 2009 and April 2011. (D.I. 75 at A-51) Neither party provided a copy of this grievance.

- On November 20, 2010, Plaintiff wrote a letter to his Unit Commander to report harassment from inmates and correctional officers Schaffer, Hannum, and McGinnis. (*Id.*, Ex. 13) He stated that Coning and Warnick labeled him a snitch. (*Id.*) He requested that the Unit Commander investigate these issues. (*Id.*)

- On December 30, 2010, Plaintiff filed Grievance 217411 to complain that Schaffer and McGinnis harassed him over the Coning Incident. (D.I. 75 at A-88; D.I. 76, Ex. 29) The grievance was returned "Non Grievable" and included the following comments:

    Complaint returned for the following reasons: Staff investigation: To request that the actions of JTVCC staff personnel be investigated write to your unit [sic] Commander with that request. If you receive no response or are dissatisfied with the response of your Unit Commander you may appeal that decision to the Operations Superintendent (Presently Major Scarborough) and ultimately the Warden.

    (D.I. 75 at A-89; D.I. 76, Ex. 29 at 2)

- On February 5, 2011, Plaintiff wrote a letter to his Unit Commander concerning Grievances 204473, 204538, and 217411. (D.I. 76, Ex. 4) Plaintiff attached a "statement of claim" to the letter (*see id.*, Ex. 3), which provides "the detailed factual basis of [his] complaints against the [Defendants]." (*Id.*, Ex. 4) After his Unit Commander failed to respond, Plaintiff sent similar letters to Major Scarborough and Warden Phelps on February 25, 2011 and March 15, 2011, respectively. (*Id.*, Exs. 5, 6)

## III.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that could affect the outcome of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). Pursuant to Rule 56(c)(1), a party asserting that a fact is genuinely disputed must support its contention either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions,

6

interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

The moving party bears the initial burden of proving the absence of a genuinely disputed material fact. *See Celotex*, 477 U.S. at 321. The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However, the existence of some evidence in support of the nonmoving party may not be sufficient to deny a motion for summary judgment. Rather, there must be enough evidence to enable a jury reasonably to find for the nonmoving party on the issue. *See Anderson*, 477 U.S. at 249. If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

## IV.    DISCUSSION

### A.    Exhaustion of Administrative Remedies

Defendants Coning, Warnick, McGinnis, Hannum, and Schaffer argue that summary judgment is proper because Plaintiff failed to exhaust his administrative remedies with respect to his snitch and retaliation claims, as required by the Prison Litigation Reform Act ("PLRA"). (D.I. 74 at 10-11) Plaintiff counters that he properly exhausted his administrative remedies to the extent they were available and, regardless, he was not required to exhaust his administrative

7

remedies because his complaints were deemed "Nongrievable." (D.I. 76 at 4-7; *see also* D.I. 78 ¶¶ 1-6)

Under the PLRA, a prisoner must properly exhaust all available administrative remedies prior to filing suit.[8] 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006); *Nyhuis v. Reno*, 204 F.3d 65, 66 (3d Cir. 2000). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules."[9] *Woodford*, 548 U.S. at 90. However, "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge." *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010). The exhaustion requirement "'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'"[10] *McKinney v. Guthrie*, 309 F. App'x 586, 588 (3d Cir. 2009) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)).

On the other hand, "Section 1997e(a) only requires that prisoners exhaust such administrative remedies 'as are available.'" *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir.

---

[8] The PLRA provides, in pertinent part: "No action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The purposes of the exhaustion requirement are: (1) to give prison officials notice and an opportunity to correct a problem before being brought into court, and (2) to reduce the quantity and improve the quality of inmate suits. *Jones v. Bock*, 549 U.S. 199, 204 (2007); *Woodford*, 548 U.S. at 89 (2006).

[9] Compliance with the prison grievance procedures is all that is required for "proper exhaustion." *Jones*, 549 U.S. at 217-18. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* at 218. *See also Spruill v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004) (explaining that a prison's grievance procedures supply the yardstick for determining the steps required for exhaustion).

[10] Exhaustion is mandatory. A prisoner must exhaust all available administrative remedies even where the relief sought, such as monetary damages, cannot be granted through the administrative process. *Booth v. Churner*, 532 U.S. 731, 735, 740-41 (2001).

2002) (quoting *Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir. 2000)). "The availability of administrative remedies to a prisoner is a question of law." *Ray v. Kertes*, 285 F.3d 287, 291 (3d Cir. 2002) (citation omitted). "'Available' means 'capable of use; at hand.'" *Brown*, 312 F.3d at 113 (citation omitted). For example, an administrative remedy may be "unavailable" if prison authorities prevent a prisoner from pursuing the prison grievance process. *See Camp*, 219 F.3d at 280-81. If no administrative remedy is available, the exhaustion requirement need not be met.[11] *Freeman v. Snyder*, 2001 WL 515258, at *7 (D. Del. Apr. 10, 2001). In addition, "prison authorities may waive the exhaustion requirement if the ultimate administrative authority fully examines the inmate's complaint on the merits, regardless of whether the complaint complied with the prison grievance process." *McKinney*, 309 F. App'x at 588 (citing *Camp*, 219 F.3d at 281).

Because an inmate's failure to exhaust under the PLRA is an affirmative defense, the inmate is not required to specially plead or demonstrate exhaustion in his complaint. *Jones v. Bock*, 549 U.S. at 127. Rather, "[d]efendants have the burden of pleading and proving failure to exhaust administrative remedies . . . in a § 1983 action."[12] *Bredbenner v. Malloy*, 925 F. Supp. 2d 649, 657 (D. Del. 2013) (citing *Ray*, 285 F.3d at 295-96).

The James T. Vaughn Correctional Center, where Plaintiff is incarcerated, follows the three-level Inmate Grievance Procedure ("IGP") set forth in the State of Delaware Bureau of

---

[11] *See also Davis v. Warman*, 49 F. App'x 365, 368 (3d Cir. 2002) (explaining that an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate"); *Watson v. Beard*, 2013 WL 4648323, at *6 (W.D. Pa. Aug. 28, 2013) ("This broad rule favoring full exhaustion admits of one, narrowly defined exception. If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement.").

[12] "Under 1997e(c) failure to exhaust is not a permissible basis for sua sponte dismissal." *Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003) (citing *Ray*, 285 F.3d at 295-96).

Prisons Procedure Manual ("Policy 4.4"). (D.I. 75 at A-130 to A-136 (DOC Policy 4.4 (revised May 15, 1998))) First, the inmate must submit a grievance within seven days of an incident to the Inmate Grievance Chair ("IGC"), for an attempt at informal resolution; second, if unresolved, the grievance is forwarded to the Resident Grievance Committee ("RGC") for a determination, which is forwarded in turn to the Warden; and third, the Bureau Grievance Officer ("BGO") conducts the final level of review.[13] (*Id.* at A-130 to A-134) The inmate has exhausted all available administrative remedies once the foregoing is completed.[14] (*Id.*)

As discussed below, Plaintiff properly exhausted his administrative remedies with respect to his snitch claim, and exhaustion was not required with respect to his retaliation claims because there were no administrative remedies available to him within the meaning of the PLRA. Consequently, the Defendants' motion for summary judgment should be denied on the issue of exhaustion.

### 1.    Snitch Claim

The Defendants argue that Plaintiff's grievance concerning his snitch claim was untimely because he did not file the grievance within seven days of the incident, as required by the IGP. (D.I. 74 at 11) According to the Defendants, Plaintiff claims that Coning and Warnick labeled him a snitch in August of 2009, but he failed to file any grievance related to the issue until June of 2010. (*Id.* at 11-12) Thus, the Defendants maintain that Plaintiff did not exhaust his administrative remedies.

---

[13] Policy 4.4 states that an inmate may file only one grievance per incident. (D.I. 75 at A-134) "Grievance" is defined as: "A written complaint concerning the substance or application of a policy or practice; any action toward an inmate by staff or other inmates; any condition or incident within the institution that affects an inmate." (*Id.* at A-130)

[14] *See Jones v. Carroll*, 536 F. Supp. 2d 507, 510 (D. Del. 2008).

Contrary to the Defendants' argument, Plaintiff timely filed the grievance concerning his snitch claim. On June 23, 2010, Plaintiff filed Grievance 204538, which states: "On 6/21/10 . . . I got jumped by 3 inmates with locks [wrapped in socks]. I was severely beaten and ambulanced to [the hospital] [sic] it was the result of Blake Warnick and Christine Coning labeling me a snitch . . . ." (D.I. 75 at A-80; D.I. 76, Ex. 2) The record reflects that Plaintiff filed the grievance two days after the incident, which satisfies the IGP's seven-day filing requirement. Moreover, Plaintiff appealed the grievance's outcome at each administrative level of the IGP until the decision became final. (*See* D.I. 75 at A-80, A-83 to A-87) Consequently, Plaintiff properly exhausted his administrative remedies.

Even assuming that Plaintiff's grievance was untimely, as the Defendants suggest, it would not change the result because the Defendants waived the time requirement for exhausting administrative remedies. The Third Circuit has recognized that "prison authorities may waive the exhaustion requirement if the ultimate administrative authority fully examines the inmate's complaint on the merits, regardless of whether the complaint complied with the prison grievance process." *McKinney*, 309 F. App'x at 588 (citing *Camp*, 219 F.3d at 280-81). *See also Spruill v. Gillis*, 372 F.3d 218, 234 (3d Cir. 2004); *Bredbenner*, 925 F. Supp. 2d at 658-59 (holding that "prison officials waived the seven-day time requirement for submitting a grievance" because they addressed the grievance on its merits).

Here, the BGO – which is the final administrative authority (*see* D.I. 75 at A-134 to A-135, A-136) – fully examined Plaintiff's grievance on the merits despite its purported untimeliness. (*Id.* at A-87) Consequently, the Defendants waived the seven-day time requirement for submitting a grievance, and Plaintiff properly exhausted his administrative remedies with respect to his snitch claim. *See Bredbenner*, 925 F. Supp. 2d at 658-59.

11

## 2.    Retaliation Claims

The Defendants assert that Plaintiff failed to exhaust his administrative remedies with respect to his retaliation claims because Plaintiff did not file grievances for the alleged retaliatory acts within the timeframe required by the IGP. (D.I. 74 at 12)

The Defendants' argument is without merit. Plaintiff was not required to exhaust his administrative remedies with respect to his retaliation claims because there were no administrative remedies available to him within the meaning of the PLRA. An administrative remedy is "an administrative scheme adopted by the state department of corrections." *See Freeman*, 2001 WL 515258, at *7. "At minimum, . . . an administrative remedy must be ascertainable by examination of statutes or regulations." *Fatir v. Dowdy*, 2002 WL 2018824, at *13 (D. Del. Sept. 4, 2002) (citing *Freeman*, 2001 WL 515258, at *7 n.9; *Conception v. Morton*, 125 F. Supp. 2d 111, 117 (D.N.J. 2000)). "Conversely, a vague, informal grievance process is 'hardly a grievance procedure.' Thus, an individual administrator's decision would not qualify as a grievance procedure." *Id.* (quoting *Freeman*, 2001 WL 515258, at *7). In fact, "[t]his is exactly the type of 'administrative remedy' that courts frown upon." *Id.* (citing *Freeman*, 2001 WL 515258, at *7).

In the present case, Plaintiff filed several grievances concerning alleged retaliation by correctional officers. (*See* D.I. 76, Exs. 1, 2, 7, 22, 23, 29) However, a number of these grievances were returned to Plaintiff as "Non Grievable" because they involved issues with prison staff.[15] (*See id.*, Exs. 7, 22, 23, 29) The returned grievances included the following comments:

---

[15] The Defendants concede this point in their Amended Answer. (*See* D.I. 47 at 3 ¶ C)

> Complaint returned for the following reasons: Staff investigation: To request that the actions of JTVCC staff personnel be investigated write to your unit [sic] Commander with that request. If you receive no response or are dissatisfied with the response of your Unit Commander you may appeal that decision to the Operations Superintendent (Presently Major Scarborough) and ultimately the Warden.

*(See, e.g., id.*, Ex. 29)

Notably, Policy 4.4 does not include the aforementioned instructions.[16] (*See* D.I. 75 at A-130 to A-136) According to prison officials, however, this "directive became policy on 9/9/2010," and "the Bureau Chief is who ultimately made it policy."[17] (D.I. 53 at 13) Nevertheless, Plaintiff attempted to comply with the unofficial procedure by writing letters to his Unit Commander, the Operations Superintendent, and the Warden, concerning the alleged retaliation by correctional officers.[18] (*See* D.I. 76, Exs. 3-6, 13-16, 18, 20-21, 28)[19]

This court has previously held that the PLRA's exhaustion requirement need not be met where administrative remedies are unavailable. *See Freeman*, 2001 WL 515258, at *7.[20]

---

[16] Furthermore, these unofficial guidelines are inconsistent with Policy 4.4, which specifically provides that under the IGP, inmates may file a grievance "concerning . . . any action toward an inmate *by staff* or other inmates." (D.I. 75 at A-130 (emphasis added))

[17] Prison officials also informed Plaintiff that "[Policy] 4.4 doesn't have the authority to investigate staff." (D.I. 76, Ex. 23 at 2)

[18] Prison officials did not respond to Plaintiff's letters.

[19] Plaintiff's letters share a factual basis with his complaint. "As long as there is a shared factual basis between th[e] two, perfect overlap between the grievance and a complaint is not required by the PLRA." *Hunt v. First Corr. Med. Servs.*, 2009 WL 320603, at *5 (D. Del. Feb. 4, 2009) (citing *Woodford*, 548 U.S. at 94-95).

[20] *Freeman* is based, in part, on the Third Circuit's decision in *Camp v. Brennan*. In *Camp*, correctional officers had made statements to the plaintiff, a prisoner, indicating that "none of his grievances would get to the Grievance Coordinator because the grievances were about the officers' co-workers." *Camp*, 219 F.3d at 280. The court held that this fact established that there were no administrative remedies available to the plaintiff within the meaning of the PLRA. *Id.* at 281. The court noted that the plaintiff's description of events, which the defendants did not refute, placed him in "something of a Catch-22 situation." *Id.*

13

Administrative remedies are considered "unavailable" where, as here, prison officials deem an incident "non-grievable." *See, e.g., Hunt v. First Corr. Med. Servs.*, 2009 WL 320603, at *6 (D. Del. Feb. 4, 2009); *Davis v. Williams*, 495 F. Supp. 2d 453, 457 (D. Del. 2007); *Baylis v. Taylor*, 475 F. Supp. 2d 484, 488-89 (D. Del. 2007); *Freeman*, 2001 WL 515258, at *5-7. Moreover, the unofficial procedure endorsed by prison officials "would not qualify as a grievance procedure" because it rests on an individual administrator's decision, and "is exactly the type of 'administrative remedy' that courts frown upon." *Fatir*, 2002 WL 2018824, at *13 (citing *Freeman*, 2001 WL 515258, at *7). Consequently, Plaintiff was not required to exhaust his administrative remedies with respect to his retaliation claims because no such remedies were available.[21]

In determining that exhaustion was not required for Plaintiff's retaliation claims, the court is cognizant of the Supreme Court's directive that "decisions of prison administrators are entitled to great deference." *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002) (citation omitted).

> In crafting the appropriate standard of review for prisoners' constitutional claims, the [Supreme] Court observed that "running a prison is an inordinately difficult undertaking." Moreover, the Court noted that "'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.'" Thus, "prison administrators should be accorded wide-ranging deference in the

---

[21] The Defendants do not address the unofficial grievance procedure described above or Plaintiff's attempts to comply with that procedure. Instead, the Defendants simply maintain that "[Plaintiff] may have his objections to the grievance policy, but those objections provide no support or excuse for the fact that he failed to comply with [the time requirements of] that policy." (D.I. 77 at 2-3) Nevertheless, even if the court were to recognize the unofficial letter-writing process as a qualified grievance procedure, summary judgment would still be improper on the issue of exhaustion. Plaintiff would have exhausted his administrative remedies by writing letters to his Unit Commander, the Operations Superintendent, and Warden, concerning the alleged retaliation by correctional officers. The procedure does not include any further requirements. Moreover, the Defendants concede that "there is no factual dispute regarding the administrative steps taken by Plaintiff with respect to his claims." (D.I. 80 at 2)

adoption and execution of policies and practices that in their judgment are needed
to preserve internal order and discipline and to maintain institutional security."

*Id.* (citations omitted).

Nevertheless, this is not the first instance in which the court has commented on ad hoc
grievance procedures in Delaware prisons. *See, e.g., Hunt*, 2009 WL 320603, at *6 ("[The
plaintiff] submitted his grievance . . . and it was returned as "non-grievable." It is clear from the
face of the grievance response that administrative remedies were unavailable to plaintiff (i.e., the
issue is non-grievable). No administrative remedy is available and, therefore, exhaustion is not
required. Accordingly, the court will deny [the] motion for summary judgment on the issue of
exhaustion of administrative [remedies]."); *Davis*, 495 F. Supp. 2d at 457 ("Plaintiff was
informed the issue was 'not grievable' because 'inmates cannot request or demand disciplinary
action on staff.' Plaintiff has no administrative remedy and, therefore, the exhaustion
requirement need not be met. Therefore, the court will deny the motion to dismiss on the basis of
failure to exhaust administrative remedies."); *Baylis*, 475 F. Supp. 2d at 488-89 ("[G]rievances
were returned as unresolved. Accordingly, plaintiff's administrative remedies are presumed
exhausted, as no further remedies are available to him. Accordingly, the court will deny the
motions to dismiss on the issue of failure to exhaust administrative remedies."); *Fatir*, 2002 WL
2018824, at *14-15 (acknowledging that exhaustion may not be required "where the prisoner
actually files a grievance or some informal complaint and is subsequently told by the grievance
board or some prison official that the claims are not grievable"); *Freeman*, 2001 WL 515258, at
*5-7 ("In this case, the court holds that the defendants have not met [their] burden because the
evidence establishes that [plaintiff's] claim was not grievable . . . , and thus, no remedy was
available to [plaintiff]."). *See also Bredbenner*, 925 F. Supp. 2d at 658-59 (issued after the
Defendants filed the pending motion) (denying summary judgment, in part, because "there was

no administrative remedy available to plaintiff through the grievance process as evidenced by the position of the prison officials that plaintiff's remedy was not through the grievance procedure but to raise the issue with his unit commander"). No basis exists to depart from the countless prior decisions of this court, which have consistently rejected the exhaustion defense under circumstances substantially similar to the present case.

### B.     Merits of Plaintiff's Snitch Claim

Plaintiff alleges that Coning and Warnick labeled him a snitch to inmates and other correctional officers, which purportedly resulted in attacks, threats and harassment. (D.I. 11 at 9) The Defendants contend that summary judgment should be granted because Plaintiff has failed to provide evidence that Coning and Warnick labeled him a snitch. (D.I. 74 at 15-16)

"This Court has recognized the serious implications of being labeled a 'snitch' in prison." *Shockley v. McCarty*, 677 F. Supp. 2d 741, 746 (D. Del. 2009) (citing *Blizzard v. Hastings*, 886 F. Supp. 405, 410 (D. Del. 1995)). In *Blizzard*, this court explained that a "snitch" label "can put a prisoner at risk of being injured." *Blizzard*, 886 F. Supp. at 410. The court further held that a prisoner's allegation that prison officials labeled him a snitch could sustain an Eighth Amendment claim where the prisoner "can show prison officials have, 'with deliberate indifference,' exposed him to an unreasonable risk of serious harm." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Helling v. McKinney*, 509 U.S. 25, 35-36 (1993)). "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (citing *Farmer*, 511 U.S. at 842). "The Eighth Amendment imposes 'a duty upon prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners.'" *Evans v. Cameron*, 442 F. App'x 704, 706 (3d Cir. 2011) (quoting *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997)).

Other courts have similarly appreciated that when an inmate is labeled a snitch, it may endanger him and subject the inmate to a substantial risk of harm. *See e.g.*, *Williams v. Horner*, 403 F. App'x 138, 140-41 (8th Cir. 2010) ("'[T]o falsely label an inmate a snitch is to unreasonably subject that inmate to the threat of a substantial risk of serious harm at the hands of his fellow inmates' under the Eighth Amendment." (citation omitted)); *Northington v. Jackson*, 973 F.2d 1518, 1525 (10th Cir. 1992) (reversing district court's dismissal of inmate's claim for Eighth Amendment violation based on a guard telling other inmates that plaintiff was a "snitch," allegedly resulting in attack on plaintiff by inmates); *Miller v. Leathers*, 913 F.2d 1085, 1088 n.* (4th Cir. 1990) ("It is impossible to minimize the possible consequences to a prisoner of being labeled a 'snitch.'"); *Laurensau v. Pluck*, 2013 WL 4779010, at *17 (W.D. Pa. Sept. 5, 2013) ("'Labeling an inmate a snitch may give rise to an Eighth Amendment violation if the prison official acted with deliberate indifference to a substantial risk of serious harm to the inmate.'" (citation omitted)); *Watson v. McGinnis*, 964 F. Supp. 127, 131 (S.D.N.Y. 1997) (holding that an inmate had stated an Eighth Amendment claim by alleging that a guard told other inmates that he was a snitch); *Thomas v. District of Columbia*, 887 F. Supp. 1, 4 (D.D.C. 1995) (finding that being "physically confronted by and threatened by inmates" after a guard started a rumor that prisoner was a snitch was "sufficiently harmful to make out an Eighth Amendment excessive force claim").

In the present case, Plaintiff has provided sufficient evidence for his snitch claim to withstand summary judgment. Plaintiff submitted numerous affidavits, grievances, and letters, all of which support his claim that Coning and Warnick labeled him a snitch. (*See, e.g.*, D.I. 75 at A-80; D.I. 76, Exs. 3-7, 12-13) Plaintiff also produced a sworn affidavit from Joseph Walls, a

JTVCC inmate, which states that Walls observed another inmate tell Plaintiff that he was a snitch and that "the police you [Plaintiff] snitched on said it."[22] (D.I. 76, Ex. 24)

Viewing the evidence in the light most favorable to Plaintiff, there are issues of material fact in dispute concerning whether Coning and Warnick labeled Plaintiff a snitch, which purportedly led to attacks and harassment by other inmates and correctional officers. Consequently, the court should deny the Defendants' motion for summary judgment. *See Hendrickson v. Emergency Med. Servs.*, 1996 WL 472418, at *5 (E.D. Pa. Aug. 20, 1996) (denying summary judgment because the plaintiff "raised a factual issue as to whether prison employees referred to him as a snitch in front of other inmates").

## C. Merits of Plaintiff's Retaliation Claims

Plaintiff alleges that Coning, Warnick, Schaffer, McGinnis, and Hannum retaliated against him in response to the Coning Incident. (D.I. 11 at 9) The Defendants argue that summary judgment should be granted because Plaintiff has failed to establish a prima facie case of retaliation. (D.I. 74 at 17)

A prisoner alleging retaliation must prove: (1) "the conduct which led to the alleged retaliation was constitutionally protected"; (2) "he suffered some 'adverse action' at the hands of the prison officials"; and (3) "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision" to take that action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (citation omitted). *See also Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). "When analyzing a retaliation claim, courts consider that the task of prison administrators and staff is difficult, and that the decisions of prison officials require deference, particularly where prison

---

[22] Viewing the affidavit in the light most favorable to Plaintiff, it reasonably can be inferred that "the police you snitched on" refers to Coning and Warnick, based on the fact that Plaintiff had assisted with an investigation of smuggling in which Coning and Warnick were allegedly implicated. (*See* D.I. 11 at 9-10; D.I. 75 at A-33 to A-35, A-118 to A-120)

18

security is concerned." *Biggins v. Willey*, 2013 WL 4511632, at \*5 (D. Del. Aug. 22, 2013) (citing *Rauser*, 241 F.3d at 334).

To establish adverse action by prison officials, the prisoner must demonstrate that the action was "'sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights.'"[23] *Mitchell*, 318 F.3d at 530 (alteration in original) (quoting *Rauser*, 241 F.3d at 333). Whether the adverse action was "'sufficient to deter a person of ordinary firmness from exercising his constitutional rights' is an objective inquiry and ultimately a question of fact." *Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012) (quoting *Rauser*, 241 F.3d at 333).

The third element requires a prisoner to show that his protected conduct was "a substantial or motivating factor" for the adverse action. *Rauser*, 241 F.3d at 333. This causal connection can be demonstrated by: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."[24] *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

> [O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.

*Rauser*, 241 F.3d at 334.

---

[23] In the prison context, the Third Circuit has held that the following actions were sufficiently adverse to sustain a retaliation claim: "several months in disciplinary confinement; denial of parole, financial penalties, and transfer to an institution whose distance made regular family visits impossible; and placement in administrative segregation that severely limited access to the commissary, library, recreation, and rehabilitative programs." *Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (citations omitted).

[24] "In the absence of that proof the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of the fact should infer causation." *Lauren W.*, 480 F.3d at 267 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

19

In the present case, Plaintiff has established constitutionally protected conduct for all of his retaliation claims. According to Plaintiff, the alleged retaliation occurred, in part, because he (1) filed a civil action against correctional officers, and (2) reported the alleged smuggling activities of correctional officers and cooperated with prison officials during a related investigation. (*See* D.I. 11 at 9-10) The Third Circuit has explained that a prisoner's filing of lawsuits against prison officials is protected activity for purposes of a retaliation claim. *Mitchell*, 318 F.3d at 530 (citing *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002); *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). Plaintiff's reporting activities were similarly protected. *See Sims v. Piazza*, 462 F. App'x 228, 233 (3d Cir. 2012) (explaining that "the activities that [the inmate] allegedly engaged in, reporting thefts and the misuse of public funds to authorities," was constitutionally protected conduct for purposes of a retaliation claim); *Dock v. Rush*, 432 F. App'x 130, 133 (3d Cir. 2011) (noting that an inmate's assistance of law enforcement personnel with investigation was protected activity, as required for a retaliation claim against prison officials).

Notwithstanding Plaintiff's established protected activity, as discussed below, only some of his retaliation claims survive summary judgment.

### 1.     Coning and Warnick

Plaintiff's retaliation claim against Coning and Warnick is sufficient to withstand summary judgment, but only with respect to certain of Plaintiff's allegations. As discussed previously, Plaintiff engaged in protected activity by filing the 2008 Litigation, and by reporting the alleged smuggling activities of correctional officers.

As to the second element of retaliation, Plaintiff has established a material issue of fact concerning whether an adverse action by Coning and Warnick occurred and was sufficient to

deter a person of ordinary firmness from exercising his constitutional rights. Specifically, Plaintiff alleges that Coning and Warnick labeled him a snitch, which purportedly led to him being attacked by inmates and harassed by correctional officers. (D.I. 11 at 9-10) A jury reasonably could find that such conduct establishes adverse action. *See, e.g.*, *Rivera v. Marcoantonio*, 153 F. App'x 857, 859 (3d Cir. 2005) (finding that the plaintiff's allegation that a prison official "encourage[ed] other [inmates] to take action against the 'snitch,' . . . if proven, would rise to the level of 'adverse action'"); *Miller v. Trometter*, 2012 WL 5933015, at *7 (M.D. Pa. Nov. 27, 2012) (holding that the plaintiff had "sufficiently alleged that [he] suffered adverse action when [a prison guard] informed other inmates that [the plaintiff] was a snitch, which resulted in his physical assault"); *Bracey v. Pa. Dep't of Corr.*, 2012 WL 750911, at *9 (W.D. Pa. Feb. 17, 2012) (finding "adverse action" by a prison official for "spread[ing] rumors identifying [the plaintiff] as a snitch and a rat, resulting in verbal abuse and 'daily death threats' from other inmates").

On the other hand, Plaintiff's remaining allegations, that (1) Coning framed him for making an unauthorized phone call, and (2) Warnick harassed him with multiple cell shakedowns, do not establish action sufficiently adverse to support a claim for retaliation as a matter of law under the facts of this case.

According to Plaintiff, Coning framed him for making an unauthorized phone call from the prison library during his work assignment.[25] (D.I. 11 at 9-10; D.I. 76 at 19-20; D.I. 75 at A-33 to A-34) The Third Circuit has recognized that the fabrication of a misconduct report constitutes adverse action sufficient to support a claim of retaliation. *See, e.g.*, *Robinson v.*

---

[25] Plaintiff does not clearly articulate which of his activities prompted Coning to frame him for making an unauthorized phone call. (*See* D.I. 11 at 9-10) Nevertheless, as discussed in this section, the alleged framing would not be actionable even if it were in response to a protected activity.

21

*Taylor*, 204 F. App'x 155, 157 (3d Cir. 2006); *Mitchell*, 318 F.3d at 530; *Smith*, 293 F.3d at 653. In the present case, however, Plaintiff did not receive a misconduct report for making the phone call. Rather, prison officials filed incident reports, apparently in order to document the incident. (*See* D.I. 75 at A-16 to A-19; *compare with id.* at A-96) Moreover, the incident reports did not result in any disciplinary action against Plaintiff and, therefore, he did not suffer any adverse action.[26] Consequently, the allegedly fabricated charges are not actionable. *See Dockery v. Beard*, 509 F. App'x 107, 111 (3d Cir. 2013) (affirming summary judgment because "the record establishe[d] that [the plaintiff] did not suffer any adverse action [since] no disciplinary action was taken with regard to the two allegedly forged misconduct reports"); *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011) (same).

In addition, Plaintiff has not provided any evidence supporting his claim that Warnick harassed him "with multiple cell shake downs and trashing [his] cell . . . more than just the ones that were logged as regular required shakedowns." (D.I. 11 at 9) A party opposing summary judgment "must do more than just rest upon mere allegations, general denials, or vague statements." *Pridgen v. Green Valley SNF LLC*, 756 F. Supp. 2d 614, 618 (D. Del. 2010) (citing *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001)). The nonmoving party "must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Id.* (citing *Anderson*, 477 U.S. at 256-57). The evidence must be adequate, as a matter of law, to

---

[26] Although Plaintiff was ultimately fired from his position at the prison library, which could support a retaliation claim, *see Sims*, 462 F. App'x at 233 (explaining that "the termination of prison employment is a sufficient deterrent to meet the pleading standard for a retaliation claim"), Plaintiff does not assert that his firing was connected to the fabricated incident report. In contrast, Plaintiff claimed (albeit in an earlier action) that he was fired from his position for having legal work containing the name of a prison guard. (*See  Miller v. Danberg*, No. 08-271-JCJ, D.I. 51 at 5)

sustain a judgment in favor of the nonmoving party on the claims. *Anderson*, 477 U.S. at 250-57; *Matsushita Elec. Indus.*, 475 U.S. at 587-89. *See also* Fed. R. Civ. P. 56(c), (e).

The record in this case includes evidence of only two shakedowns of Plaintiff's cell in which Warnick participated. One shakedown occurred on August 20, 2009 (*see* D.I. 76, Ex. 40; D.I. 75 at A-36 to A-37), and another on May 12, 2010 (*see Miller v. Danberg*, No. 08-271-JCJ, D.I. 126, Ex. A).[27] In general, cell shakedowns do not violate a prisoner's constitutional rights. *See Bell v. Wolfish*, 441 U.S. 520, 555-57 (1979) (authorizing irregular, unannounced shakedown searches of prison cells). Moreover, Warnick submitted an affidavit stating that he "did not shake down [Plaintiff's] cell every day for a week in August of [2009]" and "did not shake down [Plaintiff's] cell multiple times in any day." (D.I. 75 at A-37 ¶ 4) Consequently, there is no evidence that supports Plaintiff's allegations, and two cell shakedowns over a nine-month period do not constitute adverse action sufficient to state a claim for retaliation. *See Biggins*, 2013 WL 4511632, at *5 ("[T]he court cannot find that [plaintiff's] claims that his cells were searched, that he received disciplinary reports, and was sanctioned are the kind of adverse action[s] that would deter a prisoner of ordinary firmness from exercising his constitutional rights[.]"); *Potter v. Fraser*, 2011 WL 2446642, at *8 (D.N.J. June 13, 2011) (finding that plaintiff's allegations that certain defendants searched his cell on two occasions, threw his t-shirt in the garbage, and confiscated his commissary purchases, in retaliation for filing grievances, were not sufficiently adverse actions).

---

[27] Significantly, the evidence of record establishes that at least one of these shakedowns occurred in connection with the prison's "security team conducting random shakedowns." (*See Miller v. Danberg*, No. 08-271-JCJ, D.I. 126, Exs. A, B, C, D) Warnick was not responsible for deciding which cells to search during the May 12, 2010 shakedown. (*See id.*) Thus, Plaintiff's cell would have been searched absent any protected conduct for reasons reasonably related to legitimate penological interests. Consequently, the May 12, 2010 shakedown cannot support a claim for retaliation.

23

With respect to the third element of retaliation, Plaintiff has established that some of his protected conduct was a substantial or motivating factor for Coning and Warnick allegedly labeling him a snitch. Viewing the facts in the light most favorable to Plaintiff, a jury reasonably could infer that Coning and Warnick labeled Plaintiff a snitch because he reported them for smuggling and cooperated in a related investigation. Although the Defendants deny all of Plaintiff's allegations, the record reveals a genuine dispute of material fact, on which a reasonable juror could find for Plaintiff.

On the other hand, Plaintiff has not shown beyond mere allegations that his filing of the 2008 Litigation was a substantial or motivating factor for the alleged snitch label. Coning and Warnick submitted individual affidavits stating that they were not aware of the 2008 Litigation until October 28, 2009. (*See* D.I. 75 at A-33 to A-38) Plaintiff has not disputed this evidence. Furthermore, Plaintiff claims that Coning and Warnick labeled him a snitch prior to October 28, 2009, which rules out a causal connection between the snitch label and Plaintiff's filing of the 2008 Litigation. (*See* D.I. 11 at 9-10; D.I. 75 at A-25 to A-28, A-118 to A-119)

Consequently, Plaintiff's retaliation claim raises a genuine dispute of material fact that survives summary judgment, but only on the limited issue of whether Plaintiff's reporting of smuggling activities and cooperation in the related investigation was a substantial or motivating factor for Coning and Warnick allegedly labeling him a snitch.[28]

### 2.    Schaffer

Plaintiff claims that Schaffer retaliated against him in response to the Coning Incident by

---

[28] Although a defendant may defeat a retaliation claim by proving by a preponderance of the evidence that he would have taken the same action even in the absence of the plaintiff's protected activity, *see Rauser*, 241 F.3d at 334, the court can conceive of no reasons for labeling a prisoner a snitch that are reasonably related to a penological interest. *See Miller v. Trometter*, 2012 WL 5933015, at *7.

24

threatening him, staring at him with "grit," and "deliberately shouldering" him. (D.I. 11 at 13-14; D.I. 76, Exs. 35-37) However, even assuming Plaintiff's allegations are true, they cannot provide the basis for a retaliation claim because they are not sufficiently adverse to deter a person of ordinary firmness from exercising his constitutional rights. *See, e.g., Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) (finding that "verbal threats and [a] few gestures of racial harassment . . . are not sufficiently adverse to support a retaliation claim"); *Burgos v. Canino*, 358 F. App'x 302, 307 (3d Cir. 2009) (explaining that harassment, threats, temporary inconveniences, and denial of recreation, among other things, do not rise to level of adverse action against prisoner); *Potter v. Fraser*, 2011 WL 2446642, at *8; *Robinson v. Danberg*, 729 F. Supp. 2d 666, 679 (D. Del. 2010) ("Allegations that prison personnel have used threatening language and gestures are not cognizable claims under § 1983."). Consequently, summary judgment should be granted with respect to the retaliation claim against Schaffer.

### 3. McGinnis

Plaintiff contends that in response to the Coning Incident, McGinnis threatened to falsify a misconduct report against him, and subsequently followed through with the threat. (D.I. 11 at 11-12) Under the facts of this case, however, Plaintiff's allegations do not establish adverse action by McGinnis sufficient to support a claim for retaliation and, therefore, summary judgment is appropriate.

The Third Circuit has held that the fabrication of a misconduct report constitutes adverse action sufficient to deter a prisoner of ordinary firmness from exercising his constitutional rights. *See Smith*, 293 F.3d at 653 ("[F]alsifying misconduct reports in retaliation for an inmate's resort to legal process is a violation of the First Amendment's guarantee of free access to the courts."). On the other hand, a finding of guilt of the underlying misconduct necessarily establishes as a

matter of law that the charges were not false, and satisfies the defendant's burden of showing that he would have brought the misconduct charge even in the absence of the protected activity.[29] *Biggins*, 2013 WL 4511632, at \*5; *Walker v. Campbell*, 2011 WL 6153104, at \*7 (W.D. Pa. Oct. 31, 2011). In other words, a finding of guilt precludes a finding that the misconduct report was issued in order to retaliate against the plaintiff. *See, e.g., Bonaparte v. Beck*, 441 F. App'x 830, 832-33 (3d Cir. 2011); *Nifas v. Beard*, 374 F. App'x 241, 244 (3d Cir. 2010); *Williams v. Sebek*, 299 F. App'x 104, 106 (3d Cir. 2008). *See also Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994) (a finding of guilt based on some evidence "essentially checkmates [the] retaliation claim").

In the present case, prison officials found Plaintiff guilty of the charges in McGinnis' misconduct report.[30] (D.I. 11 at 12; D.I. 76, Ex. 34) Therefore, the misconduct report would have been issued for reasons reasonably related to legitimate penological interests despite any constitutionally protected activity in which Plaintiff may have engaged. *See Carter*, 292 F.3d at 154 (retaliation claim fails where prison officials would have disciplined inmate for policy violations notwithstanding his protected activity). Consequently, summary judgment should be granted as to the retaliation claim against McGinnis.

---

[29] To comport with the requirements of due process, there must be "some evidence" to support the finding of guilt. *Speight v. Minor*, 245 F. App'x 213, 216 (3d Cir. 2007) (quoting *Superintendent v. Hill*, 472 U.S. 445, 454 (1985)). "The 'some evidence' standard does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. 'The relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Id.* at 216-17 (citation omitted).

[30] The finding of guilt is supported by some evidence. Specifically, Plaintiff does not dispute that he was off limits and in violation of the sanction he was serving at that time. (*See* D.I. 11 at 12; D.I. 76, Ex. 34)

### 4.   **Hannum**

Plaintiff asserts that Hannum retaliated against him in response to the Coning Incident by intimidating him and searching his cell on multiple occasions. (D.I. 11 at 12-13)

The first two elements of Plaintiff's retaliation claim against Hannum are not in dispute.[31] (*See* D.I. 74 at 19-20) However, the Defendants contend that Plaintiff "has failed to produce evidence to establish a causal connection between any of the alleged interactions with Hannum, the 2008 Litigation or the Coning Incident." (*Id.* at 19) According to the Defendants, "the alleged harassment at issue occurred over a year after [Plaintiff's protected activity], a period of time too remote to establish causality." (*Id.*)

The Defendants' argument is unpersuasive and at odds with case authority from this Circuit. The Third Circuit has noted that "it is important to emphasize that it is causation, not temporal proximity [or evidence of antagonism], that is an element of plaintiff's prima facie case, and temporal proximity [or antagonism] merely provides an evidentiary basis from which an inference can be drawn." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (alterations in original) (quoting *Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 178 (3d Cir. 1997)).[32] Moreover, "the absence of immediacy between the cause and effect does not disprove

---

[31] As discussed previously, irregular, unannounced searches of prison cells do not violate a prisoner's constitutional rights. *See Bell*, 441 U.S. at 555-57. Importantly, however, "[s]ome government actions, not unconstitutional in and of themselves, may be constitutional torts if motivated in substantial part by a desire to retaliate for the exercise of a constitutional right." *Sims*, 462 F. App'x at 233 (citing *Rauser*, 241 F.3d at 333). *See also Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997) ("An otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment rights."); *White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990).

[32] The *Farrell* court further noted that "[a]lthough timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." *Farrell*, 206 F.3d at 280-81.

27

causation." *Kachmar*, 109 F.3d at 178. *See also Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (explaining that "the mere passage of time is not legally conclusive proof against retaliation"). "Indeed, where the record establishes sufficient inferences of a causal connection, the court need not consider temporal proximity at all." *Andes v. New Jersey City Univ.*, 419 F. App'x 230, 234 (3d Cir. 2011) (citations omitted).

Here, Plaintiff has adduced evidence sufficient to establish a causal relationship between his protected activity and the alleged shakedowns of his cell by Hannum. For example, Plaintiff submitted a letter that he wrote to Warden Phelps on September 28, 2010, stating that Hannum threatened him in connection with Coning. (D.I. 76, Ex. 16) According to Plaintiff, "[Hannum] said when the time was right he would get me and make it look like he was only doing his job." (*Id.*) Plaintiff describes the incident in further detail in two sworn affidavits dated September 30, 2010. (*Id.*, Exs. 17, 31; *see also* D.I. 75 at A-122)

Plaintiff wrote a second letter to Warden Phelps on October 19, 2010, stating, "as of this date, it is the third time [] Hannum has shook-down my cell and this time he pulled my cellie [sic] aside and told him that the shakedowns are about getting me as payback." (*Id.*, Ex. 18) Plaintiff produced a sworn affidavit from Devon Drummond, his cellmate at the time of the alleged cell searches, which corroborates Plaintiff's allegations. The affidavit states:

> Today, 10/18/10, will be the third time Correctional Officer Hannum shook down E-8 since John E. Miller has been my cellie [sic]. After the shake down Hannum pulled me aside and told me the shake downs arent [sic] about me, they're about getting my cellie [sic] as payback. I'm not aware of what for.

(D.I. 75 at A-129; D.I. 76, Ex. 32)

The Defendants argue that "[Drummond's] affidavit does not prove or lead to an inference that . . . Officer Hannum's actions were retaliatory." (D.I. 74 at 19) The court disagrees. The definition of the word *payback* (outside of the monetary context) is "an act of

28

revenge or retaliation,"[33] or "punishment for something that was done in the past."[34] Thus, it reasonably may be inferred from Drummond's affidavit that Hannum's alleged actions were, in fact, retaliatory.

Although Hannum denies all of Plaintiff's allegations (*see* D.I. 75 at A-49 to A-50), the record reveals a genuine dispute of material fact, and there is evidence from which a reasonable jury could conclude that the cell searches were retaliatory. Consequently, summary judgment should be denied with respect to the retaliation claim against Hannum. *See Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 532 (D.N.J. 2008) (denying summary judgment on prisoner's retaliation claim where the evidence would allow a jury to conclude that the correctional officers repeatedly searched the prisoner's cell and/or subjected him to false disciplinary charges because the prisoner filed an action against the prison). *See also Scher v. Engelke*, 943 F.2d 921, 924 (8th Cir. 1991) (denying JNOV motion because the "evidence disclose[d] ten searches in nineteen days under circumstances which a jury would be justified in finding were motivated by retaliation for [the prisoner's] efforts to blow the whistle on a corrupt guard").

### D.     Failure to Protect Claim

The Defendants contend the doctrine of collateral estoppel bars Plaintiff's failure to protect claim against Warden Phelps. (D.I. 74 at 13) According to the Defendants, the incidents that form the collective basis of Plaintiff's failure to protect claim were individually the subject of six prior motions for injunctive relief, all of which the court denied. (*Id.*) Thus, the Defendants maintain that the court "should preclude [Plaintiff's] attempts to relitigate these issues." (D.I. 77 at 4)

---

[33]     *Definition     of     Payback     in     English*,     Oxford     Dictionaries, http://www.oxforddictionaries.com/us/definition/english/payback (last visited Feb. 28, 2014.)

[34]     *Payback     Definition*,     Merriam-Webster     Dictionary,     http://www.merriam-webster.com/dictionary/payback (last visited Feb. 28, 2014.)

Plaintiff acknowledges that his failure to protect claim "encompasses those six separate incidents," but counters that collateral estoppel is inapplicable because the court did not "consider the incidents as a whole."[35] (D.I. 76 at 9)

The court agrees that collateral estoppel does not apply to Plaintiff's failure to warn claim, but for reasons different from those espoused by Plaintiff.

Collateral estoppel, also known as issue preclusion,[36] "prevents parties from relitigating an issue that has already been actually litigated." *Peloro v. United States*, 488 F.3d 163, 174 (3d Cir. 2007). Collateral estoppel applies where: "'(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment.'" *Peloro*, 488 F.3d at 174-75 (alterations in original) (citation omitted).

In the present case, the Defendants' argument fails because the first element of collateral estoppel has not been met. Specifically, the issue sought to be precluded is not the same as that involved in the prior action. The only issue decided in the prior action was whether Plaintiff would suffer irreparable harm if he were not transferred to a different prison. (*See Miller v. Danberg*, No. 08-271-JCJ, D.I. 52, 64, 91, 106, 117, 137, 154, 165, 169, 172, 173, 176) The issue pending before this court is whether Warden Phelps violated Plaintiff's constitutional rights

---

[35] Plaintiff further avers that the incidents are "accompanied by what may total out to be 3,000 acts of harassment which the Warden was made aware of." (D.I. 76 at 9) Plaintiff, however, does not describe these alleged acts of harassment and has not produced any evidence in support thereof.

[36] "The terms 'collateral estoppel' and 'issue preclusion' are frequently used interchangeably." *Walker v. Horn*, 385 F.3d 321, 336-37 n.33 (3d Cir. 2004) (citation omitted).

by failing to protect him from a substantial risk of serious harm.[37] These issues are not identical.

Consequently, the Defendants' motion for summary judgment should be denied with respect to

Plaintiff's failure to warn claim. *See Walker v. Horn*, 385 F.3d 321, 336-37 (3d Cir. 2004) ("The

only issue decided in the state court was whether [the plaintiff-prisoner] would suffer irreparable

harm if he were not force-fed. The issue in the district court was whether [the defendant] violated

[the plaintiff's] constitutional rights by force-feeding him. Those issues are obviously not

identical. Therefore, [the plaintiff's] constitutional claims against [the defendant] are not barred

by collateral estoppel.").[38]

### E.    Qualified Immunity

Warnick, McGinnis, Schaffer, and Hannum assert the qualified immunity defense.[39] (D.I.

74 at 20) The court need not address this argument with respect to McGinnis and Schaffer

because the claims against them fail on the merits. Warnick and Hannum, however, are not

entitled to qualified immunity.

As a preliminary matter, it should be noted that qualified immunity is not discussed at

length because the Defendants offer only one sentence of argument and no legal authority in

support of their position. (*See id.*) The Defendants contend that "the facts fail to establish that

any [Defendants] were aware of any clearly established constitutional violation." (*Id.*)

---

[37] In order to prevail on a failure to protect claim, a plaintiff must demonstrate that: "(1) he is incarcerated under conditions posing a substantial risk of serious harm (the objective element); and (2) prison officials knew of and disregarded an excessive risk to inmate health or safety (the subjective element)." *Miller v. Coning*, 2011 U.S. Dist. LEXIS 110731, at *4.

[38] *See also Morris v. Hoffa*, 361 F.3d 177, 189 (3d Cir. 2004) ("'[A] decision on a preliminary injunction is, in effect, only a prediction about the merits of the case.'" (alteration in original) (citation omitted)).

[39] The Defendants do not contend that Coning is entitled to qualified immunity. (*See* D.I. 74 at 20) Nevertheless, even if Coning's name was omitted in error, the qualified immunity defense would not apply to Coning for the same reasons discussed in this section relative to Warnick.

31

"Qualified immunity protects government officials from civil liability for any action that 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Salerno v. Corzine*, 449 F. App'x 118, 123 (3d Cir. 2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). *See also Rouse v. Plantier*, 182 F.3d 192, 196 (3d Cir. 1999). Qualified immunity is an affirmative defense. *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001). In determining whether defendants are entitled to claim qualified immunity, the court conducts a three-part inquiry:

(1) whether the plaintiffs alleged a violation of their constitutional rights;
(2) whether the right alleged to have been violated was clearly established in the existing law at the time of the violation; and
(3) whether a reasonable official knew or should have known that the alleged action violated the plaintiffs' rights.

*Rouse*, 182 F.3d at 196-97.

Qualified immunity is a question of law determined by the court.[40] *Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006). The "inquiry is an objective, fact-specific pursuit." *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995) (citation omitted).

The Supreme Court has explained that the right an official is alleged to have violated must have been "clearly established" in a "particularized" sense. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That is, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Therefore, "defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that [the action was lawful]; but if officers of

---

[40] However, "when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury." *Monteiro*, 436 F.3d at 405 (citing *Johnson v. Jones*, 515 U.S. 304, 313 (1995)).

32

reasonable competence could disagree on this issue, immunity should be recognized."[41] *In re City of Philadelphia Litig.*, 49 F.3d 945, 961-62 (3d Cir. Pa. 1995) (alteration in original) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As discussed previously, Plaintiff has sufficiently alleged that Warnick labeled him a snitch, and that Hannum repeatedly searched his cell. Furthermore, Plaintiff's allegations create issues of fact as to whether the alleged snitch label and shakedowns were retaliatory and in violation of Plaintiff's constitutional rights under the First and Eighth Amendments. It is well settled that retaliation for the exercise of a constitutionally protected right may violate the protections of the First Amendment. *See Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001); *White v. Napoleon*, 897 F.2d 103, 112 (3d Cir. 1990); *see also Bistrian*, 696 F.3d at 376 ("Retaliating against a prisoner for the exercise of his constitutional rights is unconstitutional."). Additionally, prison officials have a duty under the Eighth Amendment to take reasonable measures to protect prisoners from violence at the hands of other prisoners. *Evans*, 442 F. App'x at 706. *See also Benefield v. McDowall*, 241 F.3d 1267, 1269-70 (10th Cir. 2001) (holding that an Eighth Amendment claim had been stated that survived a defense of qualified immunity when prisoner alleged he had been labeled a "snitch" by a correctional officer); *Blizzard*, 886 F. Supp. at 409 (recognizing that a "snitch" label could sustain an Eighth Amendment claim). The court finds that no reasonable correctional officer in Warnick or Hannum's position at the time of the alleged conduct would have concluded that the actions were lawful. *See In re City of*

---

[41] In other words, qualified immunity may be available where "reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." *Good v. Dauphin County Social Services for Children & Youth*, 891 F.2d 1087, 1092 (3d Cir. 1989) (citing *Anderson v. Creighton*, 483 U.S. at 639-641)).

*Philadelphia Litig.*, 49 F.3d at 961-62. Consequently, they are not entitled to qualified immunity.[42]

### F.    Plaintiff's Remaining Requests

Plaintiff's motions for an evidentiary hearing (D.I. 78) and for leave to file a sur-reply brief (D.I. 79) concerning exhaustion of administrative remedies are denied as moot because the exhaustion issue has been resolved. Consequently, an evidentiary hearing and further briefing are unnecessary. *See Miller v. Taylor*, 2011 WL 1045564, at *4 (D. Del. March 15, 2011) (explaining that an evidentiary hearing is appropriate "[w]hen there is a factual dispute as to the administrative steps taken").

## V.    CONCLUSION

For the foregoing reasons, I recommend that the court grant in part and deny in part the Defendants' motion for summary judgment. Specifically, the court should grant summary judgment with respect to Plaintiff's retaliation claims against McGinnis and Schaffer, and deny summary judgment with respect to the claims against Coning, Warnick, Hannum, and Warden Phelps.[43]

---

[42] Although the qualified immunity inquiry involves disputed issues of fact (i.e., whether Warnick and Hannum committed the alleged acts), the immunity issue itself is necessarily subsumed in Plaintiff's Section 1983 claims. *See Lippay v. Christos*, 996 F.2d 1490, 1503 (3d Cir. 1993). For example, if a jury finds that Plaintiff has proven all the elements necessary to recover on his constitutional claims, it could not at the same time conclude under the facts of this case that Warnick and Hannum did not violate a "clearly established" constitutional right of which "a reasonable person would have known." Similarly, if a jury finds that Plaintiff cannot recover on his constitutional claims, then the immunity issue would become moot. *See id.* at 1503-04.

[43] Plaintiff's retaliation claim against Coning and Warnick survives summary judgment, but only on the limited issue of whether Plaintiff's reporting of smuggling activities and cooperation in the related investigation was a substantial or motivating factor for Coning and Warnick allegedly labeling him a snitch.

34

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: February 28 , 2014

Sherry R. Fallon
United States Magistrate Judge